UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
BRUCE DEL TURCO, *et al.*,

                              Plaintiffs,

     -against-

SPEEDWELL DESIGN, BFK ENTERPRISE,
LLC and BARRY KOLSKY

                              Defendants.

-----------------------------------X

**MATSUMOTO**, United States District Judge:

        Plaintiffs in this action consist of the president of

a labor organization, the Tile Setters and Tile Finishers

Subordinate Union of New York and New Jersey of the

International Union of Bricklayers and Allied Craftsman, in his

official capacity ("Local 7" or "Union"), and trustees of the

funds through which fringe benefits are provided to participants

who are members of Local 7, in their official capacities

("Funds").  Defendants are Speedwell Design, BFK Enterprises,

LLC, ("Speedwell") and its president and sole owner, Barry

Kolsky.  Speedwell is in the business of providing interior

construction work.[1]

_____

[1]     In a related action before this court, the Tile Setters and
Tile Finishers Union of New York and New Jersey, Local Union
No.7 of the International Union of Bricklayers and Allied
Craftworkers is the petitioner in an action against the
respondent Speedwell/BFK Enterprises, LLC, to compel arbitration
of disputes arising under an alleged successor agreement to the

Plaintiffs Union and Funds commenced this action against defendants, alleging that Speedwell failed to pay wages and make contributions to the funds pursuant to two sets of collective bargaining agreements entered into between the parties in 1997 and in 2001.  Plaintiff Union alleges in its complaint that defendants' failure to pay union wages is in violation of § 301 of the Labor Management Relations Act, as amended, 29 U.S.C. § 185(a) (LMRA), and seeks unpaid wages, plus interest, from 1997 through the present.  Plaintiff Funds claim that defendants' failure to contribute to benefit funds for covered work is in violation of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C §§ 1001 et seq. (ERISA), and seek unpaid contributions, plus interest and liquidated damages, from 1997 through the present.

In their answer, defendants assert state law tortious inference counter-claims against the Funds and a claim for violation of § 8(b)(4)(ii)(B) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158 (b)(4)(ii)(B), against the Union.

Pending before the court are the following motions for summary judgment: 1) Defendants' motion for summary judgment that the 2001 Agreements are not collective bargaining agreements but single-project agreements, and are invalid for

agreement at issue in the pending motions for summary judgment that are the subject of this Memorandum & Order. (See Dkt No. 06-cv-5211.)

2

fraud in the execution; 2) Defendants' motion for summary judgment that the plaintiff Union failed to exhaust contractual remedies contained in the 2001 Agreements, is barred from bringing suit by the statute of limitations, and lacks associational standing to bring a claim on behalf of its members; 3) Defendants' motion for summary judgment that they are not obligated to make contributions to the funds; 4) Plaintiff Local Funds' motion for summary judgment, joined by the International Funds and the Union, that the auditor's findings are dispositive of damages for the period between February 20, 2001 and May 31, 2003; 5) Plaintiff Union's motion for summary judgment dismissing defendants' counter-claim pursuant to § 8(b)(4)(ii)(B) of the NLRA; 6) Plaintiff International Funds' motion for summary judgment that the defendants' tortious interference counter-claim is preempted by ERISA; 7) Plaintiff Local Funds' motion for summary judgment, joined by plaintiff International Funds, dismissing defendants' tortious interference claims. For the following reasons, and upon consideration of the parties' submissions, the motions before the court are granted in part and denied in part.

## I.  Background

The record before the court reflects the following summary of undisputed facts giving rise to the present action and the pending motions.  The summary excludes any disputed issues of non-material fact and highlights any disputed issues of material fact.

### A. The Parties

Local 7 is a labor organization as defined by the LMRA, 29 U.S.C § 185, which represents tile setters and tile finishers throughout New York and New Jersey.  (Union R. 56.1 Stmt. ¶ 1.)  Pursuant to collective bargaining agreements with unions that merged to form plaintiff Local 7, union members participated in various employee benefit funds (together "the Funds" or "plaintiff Funds").  Relevant to this motion are the following plaintiff Funds: a) the Local 52 Pension Fund, the Local 52 Annuity Fund, and the Local 52 Health and Welfare Fund (together, the "Local 52 Funds"); b) the Local 77 Annuity Funds and the Local 77 Health and Welfare Fund (together, the "Local 77 Funds"); and c) the International Health & Welfare Fund (the "International Fund").  Following the filing of this lawsuit, the Local 52 Funds, and the Local 77 Funds merged into "Local Funds."

The plaintiffs in this action filed suit in their official capacities.  To the extent that named plaintiffs suing

in their official capacities no longer serve in a representative capacity of the Funds or Union, plaintiffs shall substitute new officials within fifteen days of the entry of this order. Fed. R. Civ. P. 25(c). James Bartalone is a trustee of the Local 52 Pension Fund and Bruce Del Turco is a management trustee of the Local Funds. (Del Turco Dep. 5-6, 11-12, 14-15.) Plaintiff Charles Hill was the President of Local 7 from 1993 until his retirement in 2007. (Hill Dep. 11-13.)

The defendants in this lawsuit, Speedwell and Speedwell's president and sole owner, Barry Kolsky (Kolsky Dep. 18-23), are engaged in the business of providing interior work, including tile work and flooring, to both residential and commercial customers in the New York, New Jersey and Connecticut metropolitan areas. (Am. Answer ¶ 111; Local Funds Ex. 1 at 50-53.)

### B. Additional Background Facts

In addition to his role as a trustee of the Local 52 Pension Fund, Bartalone is a member of Local 7 and employed full-time by Local 7 as a business agent. (Bartalone Dep. 11-14.) The duties of business agents include organizing employees, monitoring jobs to ensure employers comply with the terms of their collective bargaining agreements, and obtaining employment for Local 7 members, who inform business agents when they are looking for work. (Bartalone Dep. 75-77; Larweth Dep.

17-19; Hill Dep. 17, 27.)  Business agents reported to Charles

Hill during his tenure as President of Local 7 from 1993 to

2007.  (Bartalone Dep. 34-35; Hill Aff. ¶ 7.)

One way in which Bartalone organized employees was by

being contacted by subcontractors that had successfully bid

union jobs, upon which he would provide subcontractors with a

copy of the standard form agreement and discuss the terms of the

agreement with the subcontractor.  (Bartalone Dep. 18-19.)

There were other times that Bartalone was informed that a job

was a union job from a third party, such as a subcontractor who

lost a bid, and when Bartalone visited the jobsite he would find

that non-union labor was being used.  (Bartalone Dep. 25.)  In

those situations, Bartalone would alert the employers to the

problem and attempt to organize the workers.  (Bartalone Dep.

25.)

Bartalone used a pre-printed form agreement reached

with the Tile Contractors Associations (TCA) – an association of

employers – when acquiring new signatory employers.  (Bartalone

Dep. 18-19.)  Speedwell is not and never was a member of TCA.

(Hill Dep. 81.)  Generally, according to Hill, when an

independent employer, like Speedwell, signed the pre-printed

CBAs, it would sign the last page after review of the pre-

printed agreement, including the Rider, thereby agreeing to all

terms contained in the document.  (Hill Aff. ¶ 12.)

A contractor that signed a CBA with Local 7 was required to use union labor exclusively when performing covered work, contribute to employee benefit plans timely and in an amount stated in the CBA, and deduct union dues and assessments from an employee's paycheck as authorized by the employee and forward such sums to the union. (Hill Aff. ¶ 8.) "Covered work" is defined in the agreement by the geographic location of where the work is being performed and the type of work. (Hill Aff. ¶ 14.) Additionally, Local 7 would not allow its members to work alongside non-union employees, and employers who signed contracts with Local 7 were obligated to hire a workforce that consisted of 100 percent union labor. (Hill Aff. ¶ 15.)

Non-party Belle Construction Company and Belle (BCC/Belle) is a general contractor that manages construction jobs in New Jersey. BCC/Belle is owned by James Kearney. BCC/Belle maintains a list of approved subcontractors to serve as bidders for its projects. (Kearney Dep. 44-45; Macdonald Dep. 8.) Arthur McCarthy and John Brucker are project managers for BCC/Belle. As project managers, McCarthy and Brucker review bids from subcontractors and select contractors based on price. (McCarthy Dep. 10-12, 27-29; Bruckner Dep. 7, 19-20, 24-26.)

### C. Events Giving Rise to the Present Action

### i. The Edgewater Project

In 1997, Speedwell was awarded a bid for tile work at the Edgewater project, for which BCC/Belle was the general contractor and McCarthy was the project manager. (McCarthy Dep. 41-43, 56; Kolsky Dep. 100-101.) At the time that Speedwell was working on the Edgewater project, Local 7 business agents Bartalone and Uzzalino went to the jobsite. (Kolsky Dep. 104.) Kolsky was informed that Bartalone and Uzzalino were at the job site and drove to meet them there. (Kolsky Dep. 104.) When Kolsky arrived, he met Bartalone and Uzzalino in the parking lot outside of the building. (Kolsky Dep. 105.) The Local 7 agents told Kolsky that there were non-union members working at the Edgewater project, that it was a union job, and that Speedwell workers could not work at the job. (Kolsky Dep. 105-07.) Kolsky responded that it was his understanding that the job was "open shop", i.e. a mix of union and non-union labor was permitted, and, further, that he had a contract with the general contractor to fulfill. (Kolsky Dep. 106.) Kolsky suggested that the agents speak to the project manager. (Kolsky Dep. 106.) Kolsky told his workers to stop work until he had further information. (Kolsky Dep. 106.) After the Local 7 agents spoke to McCarthy, McCarthy told Kolsky that his workers could work

because it was an open shop. McCarthy directed Kolsky to return the next day. (Kolsky Dep. 108.)

When Kolsky returned the next day, McCarthy told him that the Local 7 agents were coming back and that Kolsky would have to work out the issue of his workers not being union members with them. (Kolsky Dep. 110.) When Bartalone and Uzzalino returned, they told Kolsky that if he wanted to continue working on the project he would have to purchase Union books and pay three months of dues. (Kolsky Dep. 111.) Kolsky agreed to do so and returned the next morning at which point he presented the dues to Bartalone and Uzzalino and "signed some papers." (Kolsky Dep. 112.) After that meeting, Kolsky never heard from Bartalone or Uzzalino, or the Union, until years later. (Kolsky Dep. 113.) Kolsky proceeded to pay the wages he was originally paying, and did not contribute to the benefit funds. (Kolsky Dep. 114.) According to Local 7, the documents that Kolsky signed were collective bargaining agreements – one covering residential work performed by tile setters and one covering residential work performed by tile finishers. (Virginia Decl. Exs. 2, 3; Kolsky Dep. Exs. 6, 7; Union R. 56.1 Resp. ¶ 90.)

### ii. The Waterview Project

On December 28, 2000, Speedwell submitted a bid for a subcontract to install tile as part of a commercial construction

project on Waterview Boulevard in Parsippany, New Jersey
("Waterview project"), which was managed by BCC/Belle.
Speedwell was awarded the job. (Kolsky Dep. 121.)

Prior to the start of the tile work at this job,
Bartalone was informed through a third party that there was work
being done at Waterview and went to the jobsite. (Bartalone
Dep. 70.) He was informed by the supervisor on the job that it
was completely union and that Speedwell was awarded the
contract. (Bartalone Dep. 70.) Bartalone then testified that
Kolsky called him soon after his visit and asked him for a team
for the Waterview job. (Bartalone Dep. 70-71.) Bartalone
called two workers for Kolsky. (Bartalone Dep. 74.) On the day
the tile workers started, Bartalone went to the jobsite and met
Kolsky to sign the agreement. (Bartalone Dep. 79-80.) When
Bartalone arrived at the jobsite he saw that Kolsky had two non-
union workers working, in addition to the two workers that
Bartalone sent. (Bartalone Dep. 80.) Bartalone proceeded to
tell Kolsky that Local 7 members do not work side-by-side with
non-union workers and "with that, [Kolsky] signed up the two
[other] gentlemen that were there." (Bartalone Dep. 80.)

Kolsky's testimony differed significantly from
Bartalone's regarding the Waterview project. Kolsky testified
that shortly after the tile work started in February 2001,
Kolsky, who was in his office, received a phone call from the

jobsite informing him that there were two Union representatives, one of whom was Bartalone, at the jobsite. (Kolsky Dep. 147.) Kolsky went to the jobsite to meet the Union representatives. (Kolsky Dep. 148.) Bartalone told Kolsky that the job was a "Union job and you have non-union guys on the job and you can't work." (Kolsky Dep. 149.) Bartalone and Kolsky negotiated an agreement that allowed Speedwell's subcontractor's workers in the union - "similar to what we did in Edgewater" - and that Kolsky would have to take an equal amount of workers out of the union hall and pay everyone union rate. (Kolsky Dep. 149-150.)

Kolsky directed the workers to stop working for that day. On the following business day, Kolsky signed "another pile of papers that at that point [he] assume[d] was a project labor agreement for that job because [he] was signing more of the same kind of stuff that [he] had in the past" and wrote a check for the Union books, and his workers resumed work. (Kolsky Dep. 151-152.) This paperwork included two collective bargaining agreements, both of which covered commercial work, one for tile layers, the other for tile finishers. Kolsky signed the paperwork on Speedwell's behalf. (Virginia Decl. Exs. 10, 11; Kolsky Dep. Exs. 10, 11.)

Kolsky and Bartalone testified that after signing the paperwork, Kolsky bought everyone coffee. (Kolsky Dep. 152.) Union worker Daniel Larweth, who was present at the time of

these events, stated that "there was no tension" in the room and that "everybody was happy." (Larweth Dep. 15, 25-27.) Larweth stated that when Bartalone arrived at the Waterview job that day "he wasn't upset. He wasn't screaming. He wasn't yelling." (Larweth Dep. 26-27.)

The February 2001 agreements bear handwritten alterations. (Virginia Decl. Exs. 10, 11.) On the front cover page of the agreements, handwritten at the top is "Speedwell Design" and the number "1" was handwritten over the last digit in the phrase "From May 5, 1997 to May 4 2000," thus modifying the final date to May 4, 2001. Both Bartalone and Kolsky testified that these writings on the front cover page were not in their handwriting. (Kolsky Dep. 159, 161; Bartalone Dep. 218-219.) Hill testified that these cover-page alterations were in the Sectretary/Treasurer's handwriting, although he did not see him make the changes. (Hill Dep. 174-176.) On the signature page of the agreements, "May 2000 to May 2003" is handwritten at the top. Bartalone testified that he wrote "May 2000 to May 2003" on the top of the signature pages of the agreements. (Bartolone Dep. 90, 218.) Kolsky testified that his initials appear next to Bartalone's handwritten dates at the top and that his signature appears on the last page of the agreements, and that Kolsky handwrote Speedwell's name and address, and his name. (Kolsky Dep. 156-158, 160-161.)

Local 7 asserts, and defendants deny, that these agreements are two collective bargaining agreements – one covering all tile setters and apprentices employed by Speedwell and the other covering all tile finishers employed by Speedwell. (Virginia Decl. Exs. 10,11: Kolsky Dep. Exs. 10, 11.) Neither agreement specifically referred to the Waterview project or any other particular project. (Local Funds R. 56.1 Stmt. ¶ 20.) Each agreement required that Speedwell make specified contributions to the benefits funds for each hour of covered tile work. (Virginia Decl. Ex. 10, Art. III, XVII-XX, Rider & Ex. 11, Art. II, XII-XIII.) Pursuant to the agreements, Speedwell made contributions to the Funds for work performed on the Waterview Project in February, March and April 2001. (Kolsky Dep. 183-87.)

### iii. Grand Commons Project

During the Waterview project, Kolsky mentioned to Larweth that he might need help on another small job in the fall, the Grand Commons project, unrelated to Waterview. (Kolsky Dep. 188-89.) Speedwell performed work on the Grand Commons project in September 2001. (Kolsky Dep. 191-195.) Kolsky called Larweth and requested his assistance on the Grand Commons project. (Larweth Dep. 33.) Larweth requested permission to work on the project from Bartalone, who approved him. (Larweth Dep. 33.) Larweth understood the job to be all

13

union contractors. (Larweth Dep. 33.) Speedwell made benefit contributions for the work performed by Local 7 members on this project and certified to the International Pension Fund that its contributions related to work performed that month "under the current applicable provisions of the collective bargaining agreement and the provisions of the applicable trust agreements." (Kolsky Dep. 193-195; Virginia Decl. Exs. 22-23.) Speedwell and Local 7 did not enter into an additional agreement with reference to the Grand Common job. (Local Funds R. 56.1 Stmt. ¶ 27.)

Following the Grand Commons job, Plaintiff Funds continued sending remittance forms to Speedwell and Speedwell continued to submit remittance reports to the International Pension Fund for every month from October 2001 through December 2002, all of which certify that no work was performed, and, therefore, no contribution need be made. (Virginia Decl. Exs. 24-26.) The parties dispute whether no covered work was performed and if the Funds ever contacted Speedwell regarding this issue. (See Speedwell R. 56.1 Stmt ¶ 122; Int. Funds R. 56.1 Resp. ¶ 122.)

### iv. Hudson Point Project

In 2002, BCC/Belle served as general contractor on a project known as Hudson Point. The project was an "open-shop" project and managed by McCarthy. (Kearney Dep. 51-52; McCarthy

Dep. 74.)  McCarthy selected Speedwell to do the tile, painting and carpeting work.  (McCarthy Dep. 65, 68-69, 72; Bartalone Dep. 99.)  Speedwell began performing tile work in May 2002.  (McCarthy Dep. 79.)  Speedwell subcontracted its tile work to Unlimited Tile for the installation.  (Velikiy Dep. 59-62; Bartalone Dep. 99.)

After receiving a phone call from a union contractor about the identity of the tile contractor to whom the Hudson Point bid was awarded, Bartalone went to the Hudson Point jobsite.  (Bartalone Dep. 91-92, 95, 97.)  When he arrived, Bartalone approached an individual who told him who was doing the tile work and "that was the extent of the conversation." (Bartalone Dep. 97.)

Timur Velikiy, of Unlimited Tile, testified that he spoke to Bartalone when Bartalone visited Hudson Point.  Velikiy testified that Bartalone told Velikiy that Unlimited Tile was not supposed to be working at Hudson Point.  (Velikiy Dep. 145-147.)  Velikiy testified that he "was threatened physically and mentally" and that Bartalone was a "bully."  (Velikiy Dep. 145-147.)

Bartalone testified that after he spoke with an unnamed individual (perhaps Velikiy) at Hudson Point he went to McCarthy's office, in the basement of the jobsite.  McCarthy told Bartalone that Speedwell was doing tile work, and Bartalone

stated that Speedwell's use of non-union labor was a problem because of the contract between Speedwell and Local 7. (Bartalone Dep. 92-93, 98-100.)  According to McCarthy, he told Bartalone that the job was "open shop" and that he should take the problem to Kolsky.  (McCarthy Dep. 98-100.)  Bartalone testified that McCarthy said he would call Kolsky.  (Bartalone Dep. 100.)

McCarthy testified that Bartalone stated "you're going to get a picket line."  (McCarthy Dep. 99.)  Based on the record before the court, Bartalone did not testify that he made such statement to McCarthy, or deny that he did so.  (Bartalone Dep. 98-101.)  The parties dispute the characterization of Bartalone's statement, as testified to by McCarthy, that they would get a picket line.  (<u>See</u> Speedwell R. 56.1 Stmt. ¶ 131; Union R. 56.1 Resp. ¶ 131.)  The parties also dispute whether Bartalone ever met with Kolsky regarding the Hudson Point project.  (<u>See</u> Bartalone Dep. 129; Kolsky Dep. 240-41, 243.)

The day after Bartalone's conversation with McCarthy, the painters' union put up a picket line.  The painters' union took down its picket line after an agreement was reached whereby the union members would work side-by-side with non-union workers.  (Bartalone Dep. 112-116, 122-25.)  McCarthy then attempted to resolve the issue between Local 7 and Speedwell. (Bartalone Dep. 113-114; McCarthy Dep. 111-114.)  McCarthy

testified that Bartalone stated that "he's not solving the problem. He's going to put them [Speedwell] out of business." (McCarthy Dep. 114.) This message was relayed to Kolsky by McCarthy. (McCarthy Dep. 117-119; Kolsky Dep. 461.) On the record before the court, Bartalone did not testify that he made this statement or deny that he did so. Bartalone testified that he told McCarthy that he "[did]n't work that way," referring to the deal struck between the painters' union and McCarthy in which the painters' union workers would work side-by-side with non-union workers. (Bartalone Dep. 113.)

Speedwell continued to perform at Hudson Point with a subcontractor, Unlimited Tile, which hired non-union workers. Neither Speedwell nor Unlimited Tile contributed to the Funds on behalf of those workers. (Local Funds R. 56.1 Stmt. ¶¶ 32-33.) There is no evidence that the plaintiff Union picketed the Hudson Point jobsite.

### v. TravelLodge Project

BCC/Belle was the general contractor on the renovation of the TravelLodge Hotel in Livingston, New Jersey. (Kearney Dep. 51-52.) Brucker was the project manager for BCC/Belle and the project was open shop. (Brucker Dep. 30-31, 58.) In approximately September 2002, Speedwell began tile work at the TravelLodge project. (Brucker Dep. 46, 63; Kearney Dep. 51-53.)

Bartolone visited the TravelLodge project and asked the supervisor which entity was doing the tile work, and the supervisor responded, Speedwell and Krisstone, another contractor. Bartalone testified that he told the BCC/Belle representative that Local 7 had a "problem" with the use of Speedwell for the tile work but did not elaborate as to why. (Bartalone Dep. 149-50.) The reason that Bartalone had a problem with Speedwell doing the work was because it was using non-union labor. (Bartalone Dep. 92.) The parties do not dispute that Speedwell was using non-union labor. (Local Funds R. 56.1 Stmt. ¶ 38.)

Later, Bartalone revisited the jobsite because Krisstone notified him that "someone" was doing tile work at night. (Bartalone Dep. 150-153.) When Bartalone revisited the jobsite, he found that the entire job had been completed by Speedwell at night. (Bartalone Dep. 150-153.) Bartalone spoke to someone from BCC/Belle and advised him that Speedwell was a union contractor. (Bartalone Dep. 154.) Speedwell alleges that Bartalone threatened that Local 7 would disrupt the work at the TravelLodge site by engaging in a job action if BCC/Belle continued using Speedwell as a subcontractor. (Local Funds R. 56.1 Stmt. ¶ 39; Speedwell R. 56.1 Resp. [Local Funds] ¶ 39.) Bartalone testified that he did not threaten a job action or file a grievance. (Bartalone Dep. 155.) The parties dispute

whether Bartalone's statements to Brucker were threats.
(Speedwell R. 56.1 Stmt ¶ 191; Union R. 56.1 Resp. ¶ 191.)

Speedwell was not awarded the next phase of the
TravelLodge project. (Brucker Dep. 74.) Brucker testified that
"if Jim Bartalone had not come to the project and the so-called
disruption had not occurred," Brucker would have "not
absolutely, but possibly or probably, since he was already on
the project" awarded the next phase of the project to Speedwell.
(Brucker Dep. 74.) If another contractor had outbid Speedwell,
Brucker would have given Speedwell an opportunity to revise its
bid. (Brucker Dep. 75-76.) The parties dispute the value of
this alleged lost opportunity. (Speedwell R. 56.1 Stmt. ¶ 196;
Local Funds R. 56.1 Resp ¶ 196; Union R. 56.1 Resp. ¶ 196.)
Furthermore, the tile work at the TravelLodge lobby was the sole
work that BCC/Belle did not consider awarding to Speedwell.
Thereafter, BCC/Belle awarded Speedwell work involving
installation of granite countertops in the main lobby. (Brucker
Dep. 205-07, 259-61.) Speedwell made no contributions to the
Funds in connection with the TravelLodge Project. (Kolsky Dep.
308-314.)

### vi. Pursuit of Speedwell's Alleged Contribution Delinquencies

After the meeting with McCarthy at the Hudson Point
Project jobsite in May 2002, Bartalone spoke with Hill, Local

7's President, about the situation with Speedwell.  (Bartalone
Dep. 126.)  Bartalone did not take any steps to ascertain if
Speedwell had not paid contributions for several months, but
Bartalone was aware that "Speedwell was doing tile work without
paying contributions."  (Bartalone Dep. 167.)  The parties
dispute whether Bartalone and Hill had knowledge of
delinquencies at that time.  (See, Speedwell R. 56.1 Stmt.
¶ 185; Local Funds R. 56.1 Resp. ¶ 185.)

Bartalone and/or Hill called Charles Virginia,
collection counsel.  (Bartalone Dep. 126-127; Hill Dep. 107-
112.)  Bartalone did not contact the labor lawyer because to him
"it was a funds issue."  (Bartalone Dep. 127.)  The parties
dispute whether the matter was properly referred to collection
counsel, pursuant to the Local Funds' delinquency procedures.
(Friedman Cert. Ex. 14.)  At the time that Virginia was
contacted, Bartalone was a trustee of the Local 52 Funds and
Hill was not a trustee of the Local 52, Local 77 or the
International Pension Fund ("IPF"); Hill was a member of the
Collection Committee that served the Local 52 Funds, Local 77
Funds, and Local 88 Funds.  (Bartalone Dep. 134-137; Hill Dep.
6-7.)  Bartalone did not authorize Virginia to do anything on
behalf of the International Funds.  (Bartalone Dep. 134.)
Neither Hill nor Bartalone contacted Del Turco, the
International Funds, or the Local 77 Funds before contacting

Virginia.  (Bartalone Dep. 126-29; Hill Dep. 114; Del Turco Dep. 139-141; Marks Dep. 46-73.)

The Local Funds have a collection policy pursuant to which legal counsel pursue delinquencies.  (Friedman Ex. 14.) The process that governs collection does not require authorization from trustees to institute litigation.  (Del Turco Aff. ¶ 8.)  Virginia has been authorized to seek recovery for the IPF and his activities are monitored by IPF counsel to ensure compliance with the Central Collection Unit ("CCU") procedures.  (Stuper Decl. ¶ 20.)  On occasion, the collection attorney is authorized to take action before exhausting CCU procedures.  (Stuper Decl. ¶ 37.)

After being contacted by Bartalone and/or Hill, Virginia wrote a letter to Speedwell dated May 23, 2002, on behalf of Local 52 Funds, the Local 77 Funds, and the International Funds, asserting that Speedwell had not made benefit contributions to the funds "for many months in violation of your collective bargaining agreements."  (Friedman Cert. Ex. 15.)  Del Turco was unaware that Virginia sent this letter. (Del Turco Dep. 139-141.)  The parties dispute whether Speedwell was actually delinquent at the time the letter was sent.  (See Speedwell R. 56.1 Stmt. ¶ 175; Local Funds R. 56.1 Resp. ¶ 175.) The 2001 agreements do not provide a remedy if the Funds do not follow their own collection procedures.

On June 27, 2002 Virginia wrote a letter to BCC/Belle on behalf of Plaintiff Funds which stated "We respectfully request that BCC/Belle withhold any and all monies due Speedwell and contact us to discuss the possibility of a joint checking arrangement." (Virginia Decl. Ex. 13.)

Virginia spoke with Marks, a CCU investigator employed by the International Union (affiliated with the International Fund), called BCC/Belle and left a voicemail concerning Speedwell. On October 2, 2002, Marks sent a letter to BCC/Belle concerning Speedwell on behalf of the IPF. (Marks Dep. 60-61.) The letter requested that BCC/Belle withhold monies it would normally pay to Speedwell pursuant to tile subcontracts. (Virginia Decl. Ex. 16.) Marks has no affiliation with Local 7, but included Local 7 in his letter as a result of his conversation with Virginia. (Marks Dep. 67-71.) The parties dispute whether Marks reviewed documents or conducted any investigation to ascertain whether Speedwell was required to make benefit contributions, or if he relied solely on Virginia's recitations. (Speedwell R. 56.1 Stmt. ¶205-206; Int. Fund R. 56.1 Resp. ¶ 205-206.)

### D. Plaintiffs' Alleged Damages

The Local Funds retained Marshall & Moss in the fall of 2005 to conduct an audit of Speedwell for the period between February 20, 2001 and May 31, 2003 to ascertain a measure of

damages. (Moss Dep., 116,119-20, 170, 173, 187-88.) Marshall & Moss began work on the audit by December 2005. (Virginia Decl. Ex. 34.) The objective of the audit was to ascertain whether and to what extent Speedwell's payments to its subcontractors circumvented obligations to the Local Funds. (Moss Dep. 189-195.) This required first estimating the amount of hours of covered work, and then multiplying those hours by the applicable contribution rate.

Speedwell used subcontractors to perform most of its tile installation and neither Speedwell nor the subcontractor maintained records of the number of hours worked. (Velikiy Dep. 29-30; Moss Dep. 118.) As a result, to estimate the number of hours worked, the audit required Marshall & Moss to first estimate the labor costs for covered work based on subcontractor invoices and then estimate the number of unreported hours by dividing the labor costs with an hourly wage rate. With regard to the Speedwell audit, Marshall & Moss examined disbursements and invoices to determine if an employer was hiding "covered work" and would exclude subcontractors whose employees were covered by collective bargaining agreements. (Moss Dep. 63-69.) Although Moss did not check to see if Speedwell's subcontractors had collective bargaining agreements, Unlimited Tile, a Speedwell subcontractor, was not a party to a collective bargaining agreement. (Velikiy Dep. 59; Moss Dep. 196-197.)

Marshall & Moss then reduced subcontractor invoices by amounts attributable to materials, and attributed the remaining amount to labor covered by the agreements with Local 7. (Moss Dep. 63-66.) Invoices that did not specifically parse out materials were attributed solely to labor. (Moss Dep. 63-66.) By including the entire non-material portion of an invoice in the calculation of unreported hours, Marshall & Moss did not account for a subcontractor's profit, insurance, bonding, or other expenses. (Speedwell R. 56.1 Stmt. ¶ 276.) There is no evidence that Speedwell contractors had insurance, bonding, or other expenses. (Local Funds R. 56.1 Resp. ¶ 276.) Unlimited Tile, provided some materials on its jobs, and built a profit margin of between twenty and thirty percent into its invoices. (Speedwell R. 56.1 Stmt. ¶¶ 277-278.) Marshall & Moss included in its calculations of unreported hours "rip-up" work, which is not covered work. (Speedwell R. 56.1 Stmt. ¶ 281.) In calculating the hours from the invoices of subcontractors, Marshall & Moss used different wage rates for tile setters and tile finishers. (Speedwell R. 56.1 Stmt. ¶ 285.)

To calculate the contributions owed, Marshall & Moss used standard rate tables provided by the Local Funds to apply to unreported hours without considering that a particular collective bargaining agreement between Local 7 and a given employer contained different rates. There is a dispute as to

whether the rate tables used in the audit are consistent with those established in the agreements. (Speedwell R. 56.1 Stmt. ¶ 260; Union R. 56.1 Resp. ¶ 260.) The audit calculated that Speedwell was delinquent on a total of 29 funds. (Virginia Decl. Ex. 20, 21.)

Additionally Marshall & Moss charged ten percent interest and liquidated damages of twenty percent as permitted by ERISA on all deficiencies. Some of the funds covered by the Speedwell audit are not ERISA-covered funds. (Moss Dep. 150-52.)

### E. Speedwell's Alleged Damages

Speedwell seeks to collect lost profits in the amount of $1,929,120.60, alleging that it would have been awarded contracts by BCC/Belle but for the alleged unlawful conduct of the plaintiffs at the Hudson Point and TravelLodge sites, respectively in May 2002 and September 2002. Prior to 2006, BCC/Belle's president and owner, James Kearney, did not instruct anyone at BCC/Belle to refrain from awarding work to Speedwell and did not recall any project managers informing him that Speedwell was not being awarded work because of Union problems. (Kearney Dep. 20.) Additionally, McCarthy never refrained from soliciting bids from Speedwell due to the labor dispute at Hudson Point. Despite not awarding the contract to Speedwell for additional phases of the TravelLodge project, Brucker

recommended Speedwell to MacDonald, a fellow BCC/Belle project manager.  (MacDonald Dep. 27-29.)

Speedwell's calculation of damages is based on eight projects that it bid on but that it was not awarded.  On one of these projects, BCC/Belle was not the general contractor and did not have responsibility for soliciting bids or awarding contracts.  On another one of the projects, Speedwell declined to submit a bid.  (Union Notice of Mot. Ex. 15.)  Additionally, Speedwell's bids on other projects were higher than other contractors to whom the jobs were awarded.  (Union R. 56.1 Stmt. ¶¶ 43-51.)

Ultimately, Kearney testified that he decided to remove Speedwell from the list of bidders in 2006 because of the time, money, and inconvenience this litigation had imposed on BCC/Belle, a non-party.  (Kearney Dep. 69.)

## II.  Summary Judgment Standard

A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there be no *genuine* issue of *material* fact." <u>Anderson</u> <u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 553 (2d Cir. 2005). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Id.</u> Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted).

In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. <u>Anderson</u>, 477 U.S. at 249. The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. <u>Flanigan v. Gen.</u> <u>Elec. Co.</u>, 242 F.3d 78, 83 (2d Cir. 2001).

Nevertheless, the nonmoving party cannot rest on "mere allegations or denials" but must instead "set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also Harlen Assocs. v. Incorporated Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture is [sic] insufficient to preclude the granting of the motion."); Nat'l Westminster Bank USA v. Ross, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact.").  Nor can the nonmoving party rest only on the pleadings.  Celotex, 477 U.S. at 324 (stating that Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings"); Davis v. New York, 316 F.3d 93, 100 (2d Cir. 2002).

Instead, each statement of material fact by the movant or opponent must be followed by citation to evidence which would be admissible, as required by Fed. R. Civ. P. 56(e) and Local Civil Rule 56.1(d).  When cross-motions for summary judgment are made the standard is the same as that for individual motions for summary judgment. See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).  Each motion must be considered independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party.  Id.

### III. **Defendants' Summary Judgment Motions to Dismiss Plaintiffs Union's and Funds' Claims**

#### A. **Defendants' Argument that Speedwell is not Liable to the Union or Funds because the Contract is Void**

Generally, "[a] party is bound by a contract it has signed," Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 34 (2d Cir. 1997), "regardless of his or her failure to read and understand its terms." Ecoline, Inc. v. Local Union No. 12, 271 Fed. App'x 70, 72 (2d Cir. 2008). Kolsky's signature appears on the final page of the 2001 Setters and Helpers Agreements. Regardless, defendants argue that the 2001 agreements are not valid collective bargaining agreements because 1) the contracts signed by Kolsky are ambiguous and the intent of the parties demonstrates that these agreements were project agreements, not collective bargaining agreements; and 2) the agreements are void because Local 7 procured Kolsky's signature through fraud in the execution. Consequently, the defendants argue that the contracts do not bind them to pay union-scale wages or contribute to benefits funds and that summary judgment should be granted in their favor.

#### i. Ambiguity of the Contracts

Defendants argue that the agreements signed by Kolsky are ambiguous, were only for the Waterview job, and did not bind Speedwell beyond that job. Defendants assert that the court may

thus consider the intent of the parties to determine whether the agreements are single project agreements.  Plaintiff Funds' cross-motion for summary judgment asserts that the contracts unambiguously require Speedwell to contribute to the Funds.

Whether a contract is ambiguous is a question of law. Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998).  Unless the court gleans some ambiguity from looking at the face of the contract, it will not look beyond the contract's four corners.  Am. Home Prods. Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760, 765 (2d Cir. 1984); see also Rosenblatt v. Christie, Manson & Woods Ltd., 195 Fed. App'x 11, 12 (2d Cir. 2006).  A contract provision is ambiguous "'when it is reasonably susceptible to more than one reading.'"  Haber, 137 F.3d at 695.  The court gives unambiguous contract terms their plain meaning.  Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 139 (2d Cir. 2000); see also Rosenblatt, 195 Fed. App'x at 12.

In this instance, the court looks to the face of the contracts to determine whether they were ambiguous as to their application beyond the Waterview project.  Both the Tile Setters and Tile Finishers agreements make reference to the union as the "collective bargaining agents" for the employees.  Nothing in the agreements indicates that they were job specific.  The agreements never mention the Waterview project, or even generically refer to a specific job, by stating, for example,

"the job" or "the project."  Additionally, the terms of the contracts contemplate their application to multiple jobs for which the employer might need labor.  Without reference to a specific job, the terms of the agreements govern an on-going relationship between the employer and Local 7 and provide the guidelines for notifying the union of the employer's jobs before starting a particular job and requesting workers from the union. These terms would not be necessary if the contract only applied to the Waterview project, which was already in progress. Additionally, the Tile Setters contract states "<u>If and when</u> the employer shall perform <u>any</u> work of the type covered by this agreement . . . ."  (emphasis added).  The use of "if and when" does not suggest any intention to exclude the Waterview project, which was already in progress at the time the agreement, but also indicates the contract's application to future jobs.

Additionally, the defendants have not directed the court to terms which may support the conclusion that the contracts' application is ambiguous.  Instead, the defendants urge that Kolsky's intent to be bound to the contracts only for the Waterview project creates a disputed issue as to the validity of the contract.  However, the court will not look at evidence of intent unless it determines that the contracts are

ambiguous. The court holds they are not. [2] Furthermore, there is nothing in the record indicating that Kolsky intended to limit the agreements to the Waterview project at the time he signed the agreements or expressed as much to Local 7. Kolsky's undisclosed intent is not a material issue. Robbins v. Lynch, 836 F.2d 330, 332 (7th Cir. 1988).

Accordingly, the court denies defendants' motion for summary judgment on the grounds that the contracts are ambiguous and limited to the Waterview project.

Additionally, the Plaintiff Funds' motion for summary judgment that the contracts unambiguously require Speedwell to contribute to the benefit funds is granted. Article III of the Tile Setters Agreement and Article III of the Tile Finishers Agreement set forth Speedwell's obligation to contribute to certain benefit funds. The extent of this obligation is discussed in Part IV.A, infra, with regard to the parties' cross-motions for summary judgment on the issue of liability.

### ii. Fraud in the Execution

Defendants argue that summary judgment should be granted in their favor because the agreements are void for fraud in the execution. The court notes that the defendants' Answer

---

[2]     As a result of the court's finding that the contract is unambiguously a collective bargaining agreement, it need not reach the plaintiff Local Funds' motion for summary judgment that there was no duress in the execution of the contract.

failed to plead this defense with the particularity required by Rule 9(b) of the Federal Rule of Civil Procedure. Nevertheless, the court considers defendants' assertion of this defense in their motion for summary judgment a constructive amendment to their Answer. See Anthony v. City of New York, 339 F.3d 129, 138 n.5 (2d Cir. 2003) ("Although affirmative defenses . . . must be pleaded in response to a pleading, see Fed. R. Civ. P. 8(c), the district court may, in its discretion, construe a motion for summary judgment as a motion pursuant to Fed. R. Civ. P. 15(a) for leave to amend the defendant's answer.").

"Fraud in the execution occurs where there is a 'misrepresentation as to the character or essential terms of a proposed contract,' and a party signs without knowing or having a 'reasonable opportunity to know of its character or essential terms.'" Hetchkop, 116 F.3d at 32 (citations omitted). In order to prevail on such a defense, a party is not absolved of "the basic responsibility . . . to review a document before signing it" and must show "excusable ignorance of the contents of the writing signed." Id. at 32,34 (internal quotations omitted). Proving excusable ignorance "requires a showing that the party satisfied its basic responsibility of reading what it signed." Bricklayers and Allied Craftworkers Local 2, et al. v. C.G. Yantch, Inc. et al., 316 F. Supp. 2d 130, 147 (N.D.N.Y. 2003). Examples of fraud in the execution include a party's

substitution of one type of document for another, and the substitution of a new document of the same kind as the one previously read and agreed to by the other party, but containing materially different terms.  <u>Hetchkop</u>, 116 F.3d at 32.

Defendants' argument that Kolsky's signature was procured with fraud does not rely on Kolsky's testimony that he read and signed agreements that were materially different than the agreements at issue.  Instead, defendants rely primarily on Hill's testimony that the handwriting on the cover of the agreements was made by the union's Secretary/Treasurer after the parties signed the agreements.  However, the alterations on the cover page are not "essential terms" of the contract.  These alterations simply indicate that the agreement is with Speedwell and extends the agreement until 2001, the start date of the contract between Speedwell and Local 7.  Without this page, the signature page – signed by Kolsky – would supply this information, namely, the parties to the agreement and its temporal term.

Defendants also point to the fact that there are two "Article XXVIIs" as evidence that "casts serious doubt as to whether that document represents the papers actually signed by Speedwell on the Waterview jobsite." (Def. Mem./Opp. [Local Funds] at 16.)  Even if defendants could and did establish, rather than speculate, that these Articles were added after

Kolsky's signature, this fact would not support a claim of fraud in the execution.  The defendants have not presented evidence in the record indicating that Local 7 misrepresented the terms contained in these articles to Kolsky.  Additionally, there is nothing in the record to suggest that the terms contained in either one or both of the articles substituted any essential term that Kolsky thought he was agreeing to but, in fact, was not.

Furthermore, even assuming that a material inconsistency exists between the document Kolsky signed and the added notations, defendants have not presented any facts in the record supporting an inference of "excusable ignorance."  Kolsky did not testify that he read the agreements that he signed at the Waterview project, and thus has not established what his understanding of the agreements was or what the purported misrepresentation was.  Indeed, his testimony easily lends itself to the inference that he did not, in fact, read the papers.  Kolsky merely stated that he "assumed" that the papers he signed in 2001 were of the same kind he signed in 1997. Defendants have not articulated any basis or provided any evidence in the record to support a reasonable inference that Kolsky did not have the opportunity to read the documents prior to signing them.  The undisputed facts regarding the circumstances surrounding the signing of the agreement do not

establish that Kolsky was deprived of the opportunity to review the documents, given that Kolsky is a college graduate who has worked for Speedwell since 1982 and had time to buy everyone coffee immediately after the agreement was signed.

"If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Hetchkop, 116 F.3d at 33. Because the only reasonable conclusion that could be drawn based on the record before the court is that the contract was not fraudulently executed, defendant's motion for summary judgment on this basis is denied.

Furthermore, unless, within fifteen days of entry of this order, defendants can supplement the record before the court with admissible evidence produced during discovery, which was closed on December 30, 2007 (Minute Entry 9/20/07), that raises a genuine issue of material fact that the contract was executed without fraud, summary judgment will be entered in favor of the non-moving parties. "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence." Celotex, 477 U.S. at 326. A district court's independent raising and granting of summary judgment in favor of the nonmoving party is "'an

accepted method of expediting litigation'." Ramsey v. Coughlin,
III, 94 F.3d 71, 74 (2d Cir. 1996) (citing Coach Leatherware Co.
v. Ann Taylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991)).
Further, although the district court must take care "to
determine that the party against whom summary judgment is
rendered has had a full and fair opportunity to meet the
proposition that there is no genuine issue of material fact to
be tried," Ramsey, 94 F.3d at 73-74, a court need not give
notice of its intention to enter summary judgment against the
moving party. Coach, 933 F.2d at 167.

Here, discovery closed prior to the filing of parties'
motions for summary judgment and the court finds that the facts
are fully developed so that the defendants will suffer no
procedural prejudice. While the court is mindful that
defendants' proof on their motion for summary judgment did not
necessarily include all evidence that might be presented at
trial, "prejudice is greatly diminished [because] the court's
sua sponte determination is based on issues identical to those
raised by the moving party." Id. at 167. Defendants, "had
every incentive to put forward any compelling evidence in
support of their summary judgment motion since the law
prevent[s] the district court from drawing favorable inferences
on their behalf." Id. at 167-68. Furthermore, defendants are
in the best position to establish the elements of their fraud in

the execution defense and are hereby being granted a "full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried." Ramsey, 94 F.3d at 73-74. "Absent some indication that the moving party might otherwise bring forward evidence that would affect the court's summary judgment determination," the court will grant summary judgment in favor of plaintiffs. Coach, 933 F.2d at 167.

### B. Defendants' Argument that the Union Lacks Associational Standing

Defendants argue that the Union lacks standing to recover unpaid wages allegedly owed to its members for tile contracts performed by Speedwell because it lacks associational standing. The Supreme Court in Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977), articulated the following three prong test that an organization must meet to have standing to sue on behalf of its members: "(a) [the organization's] members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. at 343. Defendants argue that the Union does not meet the third prong of the associational standing test provided in Hunt. According to the defendants, because the calculation of

individual members' wages would necessarily require the participation of individuals, the union cannot meet this prong, and, therefore, lacks associational standing. (Def. Mem./Opp. [Union] at 12-14.)

As the plaintiff Union correctly points out, the Supreme Court has held that "there is every reason to recognize the union's standing to vindicate employee rights under a contract the union obtained" and "there is no merit to the contention that a union may not sue to recover wages or vacation pay claimed by its members pursuant to the terms of a collective bargaining contract." Int'l Union v. Hoosier Cardinal Corp., 383 U.S 696, 699 (1966). Moreover, the language of § 301 of the LMRA makes clear that a union has such standing. It states, "[a]ny . . . labor organization may sue  . . . in behalf of the employees whom it represents in the courts of the United States." 29 U.S.C. § 185(b). Congress' specific grant of union standing renders the third prong of the Hunt associational standing test inapplicable. See United Food and Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 555-56 (1996).

The defendants' motion for summary judgment that the union lacks associational standing is denied.

## C. Defendants' Argument that the Union's Claims are Barred by the Statute of Limitations

Relying on DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 171 (1983), defendants contend that the plaintiff Union's claims, which allege violations of § 301 of the LMRA, are barred by the six-month statute of limitations for bringing unfair labor practice claims pursuant to § 10(b) of the NLRA. Defendants assert that plaintiff Local 7 did not take any action to enforce the collective bargaining agreements until one year after the alleged incidents giving rise to the claim and, therefore, the action should be dismissed as time-barred.

Plaintiff Union argues that the Supreme Court's decision in Hoosier Cardinal Corp., 383 U.S 696 (1966), is controlling because its claim is a straightforward breach of contract suit under § 301 of the LMRA and the six-year statute of limitations, borrowed from New York contract law, governs the action. Int. Union v. Hoosier Cardinal Corp., 383 U.S 696 (1966).

Section 301 of the LMRA does not provide a statute of limitations. When Congress creates a federal cause of action, but does not expressly provide an applicable statute of limitations, it is assumed that Congress intended the courts to adopt the limitations period of an analogous cause of action.

40

<u>Monarch Long Beach Corp. v. Soft Drink Workers, et al.</u>, 762 F.2d
228, 230 (2d Cir. 1985). The Supreme Court first articulated
this principle in the context of labor law, and § 301 of the
LMRA, in <u>Hoosier</u>, 383 U.S 696, 704 n.7 (1966).

In <u>Hoosier</u>, the plaintiff union filed an action
against an employer to recover vacation pay claimed by its
members pursuant to the terms of a collective bargaining
agreement. <u>Id.</u> at 698. The Court stated that "the timeliness
of a § 301 suit . . . is to be determined, as a matter of
federal law, by reference to the appropriate state statute of
limitations. <u>Id.</u> at 704-705. The Supreme Court expressly held
that the statute of limitations for state law contract claims
governs claims for violations of § 301 of the LMRA that are
"essentially [] action[s] for damages caused by an alleged
breach of an employer's obligation embodied in a collective
bargaining agreement." <u>Id.</u> at 704 n.7. Because the allegations
in <u>Hoosier</u> involved both written and oral contracts, the Court
held that the longer state statute of limitations period for
oral contracts applied in that case. <u>Id.</u> at 706-07.

In <u>DelCostello</u>, the plaintiffs, all employees, alleged
that the employer's work assignments violated the collective
bargaining agreement, and the union violated the duty of fair
representation by the way in which it handled the plaintiffs'
grievances. 462 U.S. at 157. The Court first determined that

there was no adequate analogy to the hybrid suit provided by state law, and, thus, turned to federal law to find an appropriate statute of limitations. Id. 162-163. The Court found that a claim for a breach of the duty of fair representation against the union was analogous to an unfair labor practices claim against an employer. Id. at 170. Section 10(b) of the NLRA establishes a six-month statute of limitations period for submitting charges of unfair labor practices to the NLRB. Id. at 169. The Court thus held that the six-month statute of limitations provided by § 10(b) was applicable. Id. at 170. Because the LMRA § 301 claim was "inextricably interdependent" with the breach of the duty of fair representation claim, and required the plaintiff to prove the same facts against each defendant, the six-month statute of limitations was applied to the § 301 claim. Id. at 164, 170.

The DelCostello Court instructed that courts should not hesitate to turn away from state law when "a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." DelCostello, 462 U.S. at 172. The DelCostello court noted that its decision was not intended to be "a departure from prior practice in borrowing limitations periods for federal causes of

action, in labor law or elsewhere." Id. at 171. Supreme Court
jurisprudence after DelCostello, on the applicable statute of
limitations in a § 301 suit has not squarely addressed the
circumstances of this case.

Following DelCostello, the Second Circuit defined a
"hybrid claim" as a claim in which "an employee has a cause of
action against both the employer and the union, where the two
claims are inextricably linked, and where the case to be proved
is the same against both." McKee v. Transco Prods., Inc., 874
F.2d 83, 86 (2d Cir. 1989). Additionally, the Circuit made
clear that "[p]laintiffs cannot circumvent the six-month
limitations period for hybrid actions by choosing to sue only
their employer." Id.

The Second Circuit has found Del Costello's reasoning
controlling in certain circumstances, particularly when an
employee is asserting a claim against an employer or union.
See, e.g, Phelan v. Local 305, 973 F.2d 1050, 1060-61 (2d Cir.
1992); McKee, 875 F.2d at 86. Additionally, when a case
involves multiple employee plaintiffs asserting a violation of
§ 8(a)(5) of the NLRA, and a labor union asserting a violation
of LMRA § 301, the Second Circuit has applied the six-month
statute of limitations to both claims based on DelCostello. UAW
v R.E. Dietz Co., 996 F.2d 592, 595 n.2 (2d Cir. 1993). In UAW,
both of the plaintiffs' claims were based on the employer's

failure to pay vacation benefits, albeit for different periods of time. The court distinguished its approach from the view that the union's claim was a straight contract dispute and stated that it would make no sense to apply different limitations periods to claims for the same benefits. Id. The court, however, "did not decide whether the contract statute of limitations would apply to a union's claim that did not so directly parallel the employees' claim, for example, a claim to compel contributions to a pension fund." Id.

The Circuit has noted, however, that DelCostello should be narrowly construed and, when appropriate, continues to refer to state law for an analogue from which to determine a limitations period. Monarch, 762 F.2d at 231. For example, in O'Hare v. Gen. Marine Transp. Corp., the court held that the six-year statute of limitations, borrowed from New York contract law, was applicable in a § 301 claim asserted by various benefits funds to recover trust fund payments due pursuant to a collective bargaining agreement. 740 F.2d 160, 163 (2d Cir. 1984). In O'Hare, the court stated that DelCostello "cannot reasonably be expanded to all § 301 claims that involve facts which might also have established an unfair labor practice charge." Id. at 168. Additionally, the Circuit looked to state law for a limitations period in Monarch, 762 F.2d at 231. In Monarch, a retailer and wholesaler filed an unfair labor

practices charge against a union, pursuant to LMRA § 303.  Id.
at 229.  The Circuit held that the concerns guiding the Supreme
Court's decision in DelCostello were not present in a violation
of LMRA § 303 claim.  Id. at 231.

The case before the court is distinguished from
DelCostello and Second Circuit authority applying that decision
because it does not involve a claim brought by an employee
against an employer or union.  For that reason, it does not fall
into the Second Circuit's definition of a "hybrid case."
Instead, this case much more closely resembles the traditional
LMRA § 301 breach of contract action that has been governed by
analogous six year state contract law statute of limitations.

Defendants argue that because the allegations by the
Union could have supported colorable unfair labor practice
charges, the six-month statute of limitations should apply based
on the reasoning in DelCostello.  Defendants' argument fails.
Despite the Second Circuit's caution against plaintiffs who
attempt to circumvent the statute of limitations, McKee, 874
F.2d at 86, not all "claims that involve facts which might also
have established an unfair labor practice charge" will be
governed by DelCostello.  O'Hare, 740 F.2d at 163.  Instead,
pursuant to DelCostello, the claims must be "inextricably
interdependent."  In this case, the allegations are limited to a

45

straightforward breach of contract claim between the union and the employer.

Although the court notes that the policy concerns guiding the Supreme Court's decision in <u>DelCostello</u> might be present when the union is the plaintiff and asserts a LMRA § 301 claim against an employer, the court finds no reason to hold that an alternative statute of limitations applies in this case. <u>Hoosier</u>'s application of state contract law to a § 301 claim by a union involving an employer's breach of the collective bargaining agreement for failure to pay vacation benefits is analogous to the plaintiff Union's claim that defendants breached the CBA by failing to pay union wages. Until the Second Circuit interprets the Supreme Court's subsequent jurisprudence as altering that which is clearly laid out in <u>Hoosier</u>, this court will refrain from doing so, noting that the Circuit has construed <u>DelCostello</u> narrowly, carved out exceptions to its rule in the context of § 301 and unfair labor practices, and acknowledged, without deciding, the open question of what statute of limitations applies in a case such as this one. <u>See</u> <u>UAW</u>, 996 F.2d at 595 n.2. The court interprets <u>DelCostello</u> as adding to the body of law from which courts can determine applicable statutes of limitations for a particular type of claim, as the court discussed in <u>Hoosier</u>.

Based on the foregoing, the court finds that the six-year statute of limitations applies to this action, as borrowed from New York contract law.[3] The defendants' motion for summary judgment on the basis of the expiration of the statute of limitations is denied.

### D. Defendants' Argument that the Plaintiff Union Failed to Exhaust Contractual Remedies

Defendant argues that plaintiff Union's failure to exhaust remedies provided in the collective bargaining agreement warrants dismissal. The Union does not dispute that the alleged collective bargaining agreements contain a grievance procedure, or that it would be bound by that procedure. The Second Circuit consistently holds that "before a plaintiff may file a claim in federal court under Section 301, it first must exhaust the grievance and arbitration procedures found within the CBA to which the litigants are parties." Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582, 305 F.3d 82, 86 (2d Cir. 2002); Gangemi v. General Elec. Co., 532 F.2d 861, 865 (2d Cir. 1976). Instead, Local 7 argues that the defendants have waived their right to arbitration because they have

---

[3]    Generally, the law of the forum state – in this case New York – controls, regardless of where the cause of action accrued. Eichleay Corp. v. Int'l Ass'n of Bridge, Street, and Ornamental Ironworkers, 944 F.2d 1047, 1062 (3d Cir. 1991). The court notes, however, that New Jersey's statute of limitations for breach of contract is also six years and, if applied, would not bar the action. N.J. Stat. Ann. § 2A:14-1.

"participated in this litigation for over five years, . . .
never suggested that these claims should have been arbitrated,
and [have] never moved to stay this litigation in favor of
arbitration."  (Union Opp. at 25.)  Alternatively, Local 7
argues that any "attempt to arbitrate the underlying disputes
would have been futile."  (Id.)

        In light of Local 7's position, the court need not
address whether the parties were bound to arbitrate this dispute
pursuant to the collective bargaining agreement.  Rather, the
question is whether the defendant has waived any right to
arbitration contained therein.  Because the court concludes that
the defendants' extensive participation in this lengthy
litigation has waived defendants' contractual remedies, the
court does not reach Local 7's alternative argument.

        When deciding the issue of whether a litigant waived
its right to exhaustion of remedies contained in a collective
bargaining agreement, the Second Circuit refers to authority
regarding the waiver of a right to arbitrate generally.  See,
e.g., Coca-Cola Bottling Co. of New York v. Soft Drink and
Brewery Workers Union Local 812, 242 F.3d 52, 57-58 (2d Cir.
2001) (citing authority); Marine Transp. Lines, Inc. v. Int'l
Org. of Masters, Mates & Pilots, 609 F. Supp. 282, 284 (S.D.N.Y.
1985).  "A party is deemed to have waived its right to
arbitration if it 'engages in protracted litigation that results

in prejudice to the opposing party.'" <u>S&R Co. of Kingston v.</u>
<u>Latona Trucking, Inc.</u>, 159 F.3d 80, 83 (2d Cir. 1998).  Waiver
is not to be "lightly inferred," but the issue is fact-specific
and there are no bright line rules.  <u>Id.</u>  Factors to consider
include: "(1) the time elapsed from the commencement of the
litigation to the [raising of the defense]; (2) the amount of
litigation (including exchanges of pleadings, and any
substantive motions and discovery); and (3) proof of prejudice,
including taking advantage of pretrial discovery not available
in arbitration, delay, and expense."  <u>Id.</u>  Prejudice results
when a party raising the defense "engages in discovery
procedures not available in arbitration, makes motions going to
the merits of an adversary's claims, or delays invoking
arbitration rights while the adversary incurs unnecessary delay
or expense."  <u>Id.</u> at 83-84 (internal quotations omitted).

       With regard to the amount of litigation, there must be
"litigation pertaining to 'substantial issues going to the
merits'."  <u>Id.</u> at 84 (citation omitted).  This factor does not
necessarily require filing of dispositive motions, but can
include the filing of a counterclaim, serving extensive
discovery requests, engaging in settlement conferences, and
briefing motions to dismiss.  <u>Id.</u>

       The court is mindful of the strong federal policy
favoring arbitration as a means of resolving labor disputes.

United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578 (1960). Nevertheless, the court finds that the defendants have waived the defense of exhaustion of contractual remedies by belatedly raising it at this stage in the litigation. The original complaint in this action was filed on October 4, 2002 and an amended complaint was filed on May 22, 2003. (Dkt. Nos. 1, 16.) Defendants answered both complaints and asserted counterclaims, but did not assert that the dispute should be arbitrated. (Dkt. Nos. 4, 20, 66.) Between May of 2003 and the filing of the present motion for summary judgment, nearly five years later in March of 2008, the docket reflects that the parties actively litigated this case, but a failure to exhaust defense was never raised, even in the defendants' amended answer asserting counterclaims, which was met with resistance from the plaintiffs.

The parties subsequently engaged in extensive discovery, which included the exchange of interrogatories, requests for production of documents, and depositions of multiple parties and witnesses. Additionally, the parties filed motions to compel discovery and the defendants filed a motion for sanctions. Ultimately, this extensive discovery culminated in the present motions and cross-motions for summary judgment. These activities – which have required considerable expenditures, by the parties as well as the court – constitute

"substantial litigation" as discussed by the Second Circuit.

S&R Co. of Kingston, 159 F.3d at 84.

Furthermore, the court finds that the plaintiffs would suffer substantial prejudice should the court dismiss the claim and compel arbitration. The parties have incurred substantial expense in their motions for summary judgment alone, in addition to the extensive discovery exchanged and the disputes previously raised and resolved by the court. This case is in its seventh year of litigation and to now dismiss it only to start anew before an arbitrator would further delay its resolution and increase the costs to the parties.

In light of these circumstances, the court finds the defendant's tardy assertion of this exhaustion defense so dubious as to appear to be a last ditch effort to further delay a resolution of this case. As a result, the court finds that the defendant waived its right to contractual remedies. The defendant's motion for summary judgment on this basis is denied.

### E. Defendants' Argument that Speedwell is not Liable for Contributions to the Funds because the Filing of this Action Violated ERISA

Defendants argue that the Local Funds violated ERISA by filing a collection action without the knowledge or consent of the management trustees of the Local 52 Funds, or any trustees of the Local 77 Funds. As a result, the defendants assert that the Local Funds are not entitled to contribution

payments.  Defendants rely on <u>Kilkenny v. Guy C. Long, Inc.</u>, 288 F.3d 116, 124 (3d Cir. 2000) and <u>Alfarone v. Bernie Wolff Constr. Corp.</u>, 788 F.2d 76 (2d Cir. 1986) for the proposition that "ERISA requires that a fund consult with management trustees and obtain their consent before filing an action to collect allegedly delinquent contributions." (Def. Opp. Local Funds at 2.)  In both of these cases, the fund's union trustees prosecuted a lawsuit against an employer on behalf of the fund despite the management trustees' express objection to seeking contribution funds from the employers.  <u>Kilkenny</u>, 288 F.3d at 119-120; <u>Alfarone</u>, 788 F.2d at 77.  The governing plan agreements provided for arbitration prior to pursuing judicial remedies in the event of a deadlock.  <u>Kilkenny</u>, 288 F.3d at 119-120; <u>Alfarone</u>, 788 F.2d at 79.  As a result of the failure to exhaust arbitration, the court determined that the trustees did not have standing to bring a claim.  <u>Kilkenny</u>, 288 F.3d at 124; <u>Alfarone</u>, 788 F.2d at 79.  To the extent that these cases held that ERISA requires that a fund consult with management trustees before filing a collection action, it was because "ERISA expressly requires that the acts of trustees be in accordance with trust agreements" which, in these cases, required arbitration in the event of a deadlock among trustees as to whether to bring a collection claim.  <u>Alfarone</u>, 788 F.2d at 79; <u>Kilkenny</u>, 288 F.3d at 124.

Defendants have not presented any basis on which this court could reasonably conclude that the management trustees' position on whether to file a collection action was comparable to those trustees in _Alfarone_ and _Kilkenny_.  Defendant primarily relies on the fact that Del Turco, an employer-trustee, was unaware that a lawsuit had been filed against Speedwell.  However, this fact is not sufficient to establish that the trustees were deadlocked and that the agreements required that alternative remedies, such as arbitration, be exhausted before filing an action.  No trustee has expressed opposition to the Local Funds' prosecution of this action against Speedwell.  Furthermore, the defendants have not cited evidence that Del Turco's lack of knowledge about the action was in violation of the plan trust agreements.  Consequently, defendants' motion for summary judgment dismissing plaintiff Funds' claims on this basis is denied.

### F. Defendants' Argument that Speedwell is not Liable for Contributions to the Funds because the Contribution Obligations are Illegal

Defendants argue that it is illegal for Speedwell to contribute to the benefit funds because they were not operated in accordance with LMRA § 302.  Specifically, the defendants argue that LMRA § 302 was violated because (1) the funds were used for impermissible purposes, including for union purposes, because the Union dominated the Local Funds, and (2) because not

all of the funds for which contributions are sought are listed

in the written agreements.  Section 302 of the LMRA, 29 U.S.C. §

186, states, in relevant part:

> (a) It shall be unlawful for any employer or
> association of employers or any person who acts
> as a labor relations expert, adviser, or
> consultant to an employer or who acts in the
> interest or an employer to pay, lend, or deliver,
> or agree to pay, lend, or deliver, any money or
> other thing of value--
>
>> (1) to any representative of any
>> of his employees who are employed
>> in an industry affecting commerce;
>> or
>>
>> (2) to any labor organization, or
>> any officer or employee thereof,
>> which represents, seeks to
>> represent, or would admit to
>> membership, any of the employees
>> of such employer who are employed
>> in an industry affecting commerce
>>
>> .  .  .
>
> (c) Exceptions. The provisions of this section shall
> not be applicable
>
>> .  .  .
>>
>> (5) with respect to money or other
>> thing of value paid to a trust
>> fund established by such
>> representative, for the sole and
>> exclusive benefit of the employees
>> of such employer, and their
>> families and dependents (or of
>> such employees, families, and
>> dependents jointly with the
>> employees of other employers
>> making similar payments, and their
>> families and dependents):

*Provided,* That (A) such payments
are held in trust for the purpose
of paying, either from principal
or income or both, for the benefit
of employees, their families and
dependents, for medical or
hospital care, pensions on
retirement or death of employees,
compensation for injuries or
illness resulting from
occupational activity or insurance
to provide any of the foregoing,
or unemployment benefits or life
insurance, disability and sickness
insurance, or accident insurance;
(B) the detailed basis on which
such payments are to be made is
specified in a written agreement
with the employer, and employees
and employers are equally
represented in the administration
of such fund, together with such
neutral persons as the
representatives of the employers
and the representatives of
employees may agree upon and in
the event the employer and
employee groups deadlock on the
administration of such fund and
there are no neutral persons
empowered to break such deadlock,
such agreement provides that the
two groups shall agree on an
impartial umpire to decide such
dispute, or in event of their
failure to agree within a
reasonable length of time, an
impartial umpire to decide such
dispute shall, on petition of
either group, be appointed by the
district court of the United
States for the district where the
trust fund has its principal
office, and shall also contain
provisions for an annual audit of
the trust fund, a statement of the
results of which shall be

available for inspection by
interested persons at the
principal office of the trust fund
and at such other places as may be
designated in such written
agreement; and (C) such payments
as are intended to be used for the
purpose of providing pensions or
annuities for employees are made
to a separate trust which provides
that the funds held therein cannot
be used for any purpose other than
paying such pensions or
annuities[.]

In <u>Local 144 Nursing Home Pension Fund v. Demisay</u>, 508 U.S. 581, 587-588 (1993), the Supreme Court held that "[a] 'violation' of § 302 occurs when the substantive restrictions in §§ 302(a)and (b) are disobeyed, which happens, not when funds are administered by the trust fund, but when they are 'paid, lent, or deliver[ed]' to the trust fund, § 302(a), or when they are 'receive[d], or accept[ed]' by the trust funds, § 302(b)(1)." The exceptions to the violations set forth in paragraph (c)(5) relate to the purpose for which the fund is *established*, not to the purpose for which the fund is in fact *used*. <u>Id.</u> at 588. The Second Circuit subsequently held that <u>Demisay</u> forecloses an argument that payments to a benefit fund would be in violation of the law because of the way in which the fund was operated. <u>Devito v. Hempstead China Shop</u>, 38 F.3d 651, 653 n.3 (2d Cir. 1994).

Defendants' arguments that § 302 was violated because the funds were used for impermissible purposes, including for union purposes, and because the Union dominated the Local Funds rely exclusively on the purposes for which the funds are used and operated, rather than on the purposes for which they were established. Demisay precludes this argument. Regardless of whether the funds were operated or used in a manner inconsistent with § 302, defendants would still be required to contribute to the funds. See Nat'l Stabilization Agreement of the Sheet Metal Indus. Trust Fund v. Commercial Roofing & Sheet Metal, 655 F.2d 1218, 1226-1227 (D.C. Cir. 1981) (explaining that courts have acted to restrain § 302(c)(5) violations to ensure proper flow of benefits). Therefore, defendants' motion for summary judgment to dismiss the Funds' claims on this basis is denied.

Defendants additionally argue that § 302 requires that funds be established by written agreement and, therefore, contributions may only be sought for the following funds enumerated in the 2001 Tile Setter Agreement: 1) Pension, 2) International Pension Fund, 3) Annuity, 4) Welfare, 5) Promotion, and 6) International Masonry Institute; and the following funds in the 2001 Tile Finishers Agreement: 1) International Pension Fund, 2) Bricklayer and Allied Craftsmen Retirement Fund, 3) Bricklayer and Allied Craftsmen Welfare Fund, and 4) Industry Fund.

Section 302(c)(5)(B) requires that contributions to funds be pursuant to a written agreement. The Second Circuit has strictly construed this requirement, stating "the only employer contributions which may be accepted by the trustees administering the fund are those contributions from employers who have a written agreement with the union as required by subsection 302(c)(5)(B)." Mongolia v. Geoghegan, 403 F.2d 110, 116 (2d Cir. 1968). "Absent a written agreement, there is no valid Section 302 trust as to those employer contributions[.]" Id.

Although courts generally require a *signed* agreement, id. at 118-119, what constitutes a "written agreement" is less strictly construed. The Second Circuit has recognized that a written agreement may be a "written collective bargaining agreement or any other written agreement." Id. at 115; Trs. of Int'l Bhd. of Teamsters Local 531 Sick and Welfare Fund v. Marangi Bros., Inc., 289 F. Supp. 2d 455, 462-63 (S.D.N.Y. 2003). Among documents that courts have found to satisfy the written agreement requirement in § 302(c)(5)(B) of the LMRA, in addition to a collective bargaining agreement, are signed remittance reports that clearly reference each of the individual funds. See Composition Roofers Union Local No. 30 Welfare Trust Fund v. L.A. Kennedy, Inc., Civ 93-1558, 1996 U.S. Dist. LEXIS 5737, at *12-15 (E.D. Pa. May 3, 1996). The two factors

critical to the determination of whether § 302 has been complied

with are 1) whether there is a writing that clearly refers to

the collective bargaining agreement, and 2) whether the conduct

of the defendant in paying past contributions evidences an

intent to be bound by that employee benefit trust agreement or

CBA.  Id.; Moriarty v. Brust Funeral Home, Ltd., No. 95-C-333,

1995 U.S. Dist. LEXIS 11374, at *14-15 (N.D. Ill. Aug. 9, 1995).

The foregoing analysis compels the conclusion that

plaintiff funds can seek contributions for the funds delineated

in the written agreements, which, based on the record before the

court, are the 2001 collective bargaining agreements and

Speedwell's remittance reports.  The court holds that these

reports satisfy the critical factors delineated above, at least

to the extent that they raise a genuine issue of fact as to

whether the listed funds were set up pursuant to written

agreements.  The reports refer explicitly to the collective

bargaining agreements, are signed by a purported representative

of Speedwell and the defendant paid past contributions.

Furthermore, the court cannot discern, based on the

record before it, which of the funds in the auditor's report

were not pursuant to a written agreement, whether such agreement

is a collective bargaining agreement, remittance report, or

other qualifying agreement.  Because there remains a disputed

issue of fact as to which, if any, of the funds in the auditor's

report are not pursuant to a written agreement, the defendants'
motion for summary judgment on this basis is denied.

### IV. Plaintiffs Union and Funds' Motions for Summary Judgment

#### A. Plaintiffs' Argument that the Audit is Dispositive as to Damages

The court next addresses the Plaintiff Funds' motion
for summary judgment that the auditors' findings are dispositive
on the issue of damages for the period between February 20, 2001
and May 31, 2003. Plaintiff Union incorporates by reference the
Local Funds' arguments regarding Speedwell's liability to Local
7 for "unpaid dues and contributions." (Union Mem. at 3.)
However, because Plaintiff Union did not state a claim for dues
or any other contributions allegedly owed to it aside from
unpaid wages in its Amended Complaint, summary judgment that
Speedwell is liable for such payments is denied.

ERISA imposes a statutory duty on an employer to
"maintain records with respect to each of his employees
sufficient to determine the benefits due or which may become due
to such employees . . . and to furnish to the plan administrator
the information necessary for the administrator to maintain
[such] records." 29 U.S.C. § 1059(a). Pursuant to the
collective bargaining agreements, the Funds were authorized to
audit Speedwell's employment records. After initiating this

lawsuit, the Funds hired an auditor to ascertain the amount of contributions due.

In support of their motion for summary judgment, plaintiffs urge the court to adopt the burden-shifting analysis adopted by some Circuits and favorably cited by the Second Circuit.  See, e.g., Brick Masons Pension Trust v. Indus. Fence and Supply, 839 F.2d 1333, 1333-39 (9th Cir. 1988); see also N.Y. Teamsters Council Health and Hosp. Fund v. Estate of DePerno, 18 F.3d 179, 183 (2d Cir. 1994).  Pursuant to this analysis, the Funds must establish a prima facie case by demonstrating the inaccuracy of the employer's contributions. Brick Masons, 839 F.2d at 1338.  Once the funds produce such evidence, the burden is on the employer to produce evidence of the precise amount of work performed, or evidence that the assumptions underlying the audit are incorrect.  Id.  However, while lower courts have applied the burden shifting analysis at trial, they have declined to do so at the summary judgment stage.  See Demolition Workers v. Mackroyce Contracting Corp., 97 CV 4094 (LMM), 2000 U.S. Dist. LEXIS 3548, at *21-23 (S.D.N.Y. Mar. 22, 2000);  Central Pension Fund of the Int'l Union of Operating Eng'rs and Participating Employers v. Murphy's Tire, Inc., 1998 U.S. Dist. Lexis 19369, at *22 (N.D.N.Y. Dec. 9, 1998).  Instead, the proper question is

whether there remains a factual dispute as to the contributions owed to the Funds.

The court finds that the audit does not establish undisputed facts as to the contributions owed to the Funds. The defendants point out that the auditors relied on contributions to funds that were not memorialized in writing. As discussed in Part III.F, supra, the contribution obligations are limited to those funds that were established pursuant to written agreements. Therefore, to the extent that the auditor's calculations include additional funds, they are inaccurate. Based on the record before it, the court cannot decipher which funds were included in the auditor's report and which are pursuant to written agreement. As a result, there is an outstanding issue of fact.

Additionally, the defendants argue that the auditors did not determine if subcontractors had collective bargaining agreements with other unions, or if the standard rate tables used were consistent with the rate tables in the agreements. The defendants furhter argue that the auditors did not account for expenses beyond materials when determining the amount of hours of covered work a particular invoice reflected. The results of the audit, argue defendants, were inconsistent in that the hours worked were different for tile setters and tile finishers, who work in tandem.

The court finds that the evidence presented by the defendants raises disputes of material fact as to the auditors' calculations of the amount of covered work performed in the geographical area. As a result, there is a genuine issue of material fact as to the amount of contributions owed to the funds. Summary judgment is denied as to the amount of damages owed.

### B. Plaintiff Union's Motion for Summary Judgment Dismissing Defendants' § 8(b)(4) Counterclaim

Through its amended answer, defendants asserted a counterclaim against plaintiff Union alleging a violation of § 8(b)(4)(ii)(B) of the NLRA for unlawfully threatening or coercing BCC/Belle to cease doing business with Speedwell. (Am. Answer Count I.) Plaintiff Union argues that summary judgment should be granted on defendants' counterclaim alleging a violation of § 8(b)(4)(ii)(B) of the NLRA because there is no evidence that Local 7 unlawfully threatened or coerced BCC/Belle, and even if there is, there is no evidence that the actions were motivated by an unlawful objective or motive, or are causally connected to the alleged damages. (Union Mem. at 4-24.) Defendant argues that summary judgment is inappropriate because there is a genuine issue of material fact as to whether the plaintiff union's actions violated § 8(b)(4)(ii)(B). Upon consideration of the parties' submissions and the record, and

for the following reasons, the court grants plaintiff Union's motion for summary judgment in part and denies it in part.

Section 8(b)(4)(ii)(B) of the NLRA, makes it unlawful for a union "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person."  29 U.S.C. § 158(b)(4)(ii)(B).  The determination of whether § 8(b)(4)(ii)(B) has been violated "necessitates examination in depth of the facts."  Carrier Air Conditioning, Co. v. NLRB, 547 F.2d 1178, 1181 (2d Cir. 1976).

To establish a violation of this section, the plaintiff must first show that a union threatened, coerced or restrained a neutral employer.  With regard to this first criterion, the Second Circuit acknowledges "Congress's intention to outlaw a fairly broad range of economic pressure tactics."  Carrier Air, 547 F.2d at 1191.  Section 8(b)(4) prohibits certain types of secondary picketing aimed at a neutral employer.  NLRB v. Int'l Union of Operating Eng'rs, 400 U.S. 297, 303-304 (1971).  Section 8(b)(4), however, does not prohibit a union from informing secondary employers of, or "threatening" secondary employers with, picketing of primary

employers.  NLRB v. Ironworkers Local 433, 850 F.2d 551, 555-558

(9th Cir. 1988).  Additionally, § (8)(b)(4)(ii)(B) coercive

activity could include acts other than picketing or boycotting.

NLRB v. Fruit & Vegetable Packers Local 760, 377 U.S. 58, 68

(1964) ("the prohibition of § 8(b)(4) is keyed to the coercive

nature of the conduct, whether it be picketing or otherwise").

        The second element a plaintiff must establish is that

the objective of such union conduct was to force a neutral

employer to stop doing business with another.  Carrier Air, 547

F.2d at 1188.  An analysis of the second criterion "necessarily

involves an inquiry into 'whether, under all the surrounding

circumstances, the Union's objective was preservation of work .

. ., or whether the agreements and [related activities] were

tactically calculated to satisfy union objectives elsewhere.'"

Id. at 1181 (citing Nat'l Woodwork Mfrs. Ass'n v. NLRB, 386 U.S.

612, 644 n.38 (1967)).  "[W]hether a union's conduct had an

improper 'object' is a question of fact; moreover, that 'object'

need not be the only one."  Bedding, Curtain, and Drapery

Workers Union v. NLRB, 390 F.2d 495, 499 (2d Cir. 1968); see

also Iodice v. Calabrese, 512 F.2d 383, 388 (2d Cir. 1975).

        Finally, proving a § 8(b)(4) violation is, in itself,

insufficient to establish damages under § 8(b)(4).  Feather v.

United Mine Workers of America, 903 F.2d 961, 966 (3rd Cir.

1990); C&D Restoration v. Laborers Local 79, 02 Civ 9448, 2004

U.S. Dist. LEXIS 5752, *15 (S.D.N.Y. April 5, 2004); Betal
Envtl. Corp. v. Laborers Local 78, 162 F. Supp. 2d 246, 255
(S.D.N.Y. 2001).  Plaintiff must show that there is a causal
nexus between the unlawful secondary activity and the injury
suffered by the plaintiff.  A causal nexus requires a showing
that the unlawful activity was a "substantial factor or material
cause" of the plaintiff's injury.  C&D Restoration, 2004 U.S.
Dist. LEXIS 5752 at *14-15.

        In support of its claim that Local 7 threatened or
coerced BCC/Belle, the primary Union acts on which Speedwell
relies are Bartalone's alleged statement to McCarthy at the
Hudson Point jobsite that BCC/Belle would get a picket line, and
his statements to Brucker at the TravelLodge jobsite that
Brucker was going to get a job action.  Speedwell alleges that
Bartalone's statements to BCC/Belle's project managers caused
BCC/Belle to stop awarding contracts to Speedwell, resulting in
lost profits damages.

        There is a genuine issue of material fact as to
whether Bartalone even made such statements, and, if he did, if
they were "threats."  "Summary judgment is inappropriate where
there is a dispute as to whether the threats were actually
made."  Ebers Bros. Wine & Liquor Corp. v. Teamsters, No. 02-CV-
6229T, 2005 WL 290142, *5 (W.D.N.Y. Feb. 7, 2005).

Additionally, there is a genuine issue fact as to whether the union's objective was to enforce its agreement or to force BCC/Belle to cease doing business with Speedwell. The Union asserts that it was enforcing the terms of its contract with Speedwell and that BCC/Belle's ceasing of business with Speedwell would not be in the best interests of Local 7's members. Defendants allege that Bartalone stated that he wanted to put Speedwell out of business, evidencing his unlawful objective. Viewing the totality of the facts in the light most favorable to the non-movant, a reasonable juror could find in favor of defendants.

Finally, for defendant's claim to survive plaintiff's motion for summary judgment, defendants must present a genuine issue of fact as to whether Local 7's alleged conduct at the Hudson Point and TravelLodge jobsite was a substantial factor in, or materially caused BCC/Belle to cease business with Speedwell. The parties do not dispute that BCC/Belle ceased using Speedwell for its tile setting jobs. (See Part I.E., supra.) They dispute, however, why BCC/Belle ceased doing business with Speedwell. Speedwell argues that Local 7's threats at BCC/Belle jobsites caused BCC/Belle to stop awarding it bids to Speedwell, and lists eight projects on which BCC/Belle worked, starting with the TravelLodge project, that Speedwell allegedly would have been awarded but for Local 7's

illegal conduct. The primary support for this assertion is the testimony of Brucker, the BCC/Belle project manager at TravelLodge, who stated that he probably would have awarded subsequent phases of that project to Speedwell had it not been for Bartalone's conduct. Plaintiffs dispute this testimony, noting that Speedwell performed subsequent work at the TravelLodge project.

Local 7 argues that Speedwell was not awarded those projects for several reasons other than Bartalone's actions, including that Speedwell was not the low bidder on some projects, it was not a bidder on another, and BCC/Belle was not the general contractor on yet another. Furthermore, Local 7 cites testimony from Kearney indicating that his decision to stop awarding bids to Speedwell was made in 2006 and was due to the inconvenience caused by this litigation.

The testimony of Brucker, the project manager at TravelLodge, and Kearny, in consideration of the plaintiff's opposing evidence, raise genuine issues of fact as to whether Bartalone's activity was a "substantial factor or material cause" in BCC/Belle's lack of further business with Speedwell, with regard to tile work at the TravelLodge site. Therefore, plaintiff's summary judgment is inappropriate on the claim as it relates to the TravelLodge project. However, based on the record before the court, no reasonable conclusion can be drawn

that Bartalone's actions at TravelLodge and at Hudson Point were a "substantial factor [in] or material cause" of the lack of success Speedwell had in being awarded the other projects. As a result, plaintiff's motion for summary judgment as it relates to alleged damages from projects, other than TravelLodge, is granted.

### C. Plaintiff Funds' Summary Judgment Motions to Dismiss Defendants' Tortious Interference Counterclaims

#### i. Plaintiff International Funds Argument that the Tortious Interference Counterclaim is Preempted by ERISA

By their Amended Answer of September 28, 2005, defendants asserted tortious interference counterclaims against the Funds. (Am. Answer Count II.). The International Funds argue that the defendants' counterclaim alleging tortious interference with contractual relations is preempted by ERISA, and should therefore be dismissed. Upon consideration of the parties' submissions, and for the following reasons, the International Funds motion is denied.

ERISA provides that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). As the Supreme Court has recognized, "ERISA's nearly limitless 'relates to' language offers no meaningful guidelines to reviewing judges."

<u>Gerosa v. Savasta & Co., Inc.</u>, 329 F.3d 317, 323 (2d Cir. 2003)

(citing <u>Rush Prudential HMO, Inc. v. Moran</u>, 536 U.S. 355, 365-66

(2002)).  As a result, the court must "look instead to the

objectives of the ERISA statute as a guide to the scope of the

state law that Congress understood would survive."  <u>N.Y.</u>

<u>Conference of Blue Cross & Blue Shield Plans v. Travelers Ins.</u>

<u>Co.</u>, 514 U.S. 645, 655 (1995).

The Supreme Court in <u>Travelers</u> instructed that

analysis under ERISA's preemption clause must begin with the

"presumption that Congress does not intend to supplant state

law."  <u>Id.</u> at 654.  Therefore "to overcome the anti-preemption

presumption, a party challenging a [state law] must convince a

court that there is something in the practical operation of the

challenged [law] to indicate that it is the type of law that

Congress specifically aimed to have ERISA supersede."  <u>Plumbing</u>

<u>Ind. Bd. v. E.W. Howell Co.</u>, 126 F.3d 61, 67 (2d Cir. 1997)

(noting that "the Court's more recent decisions have moved away

from ["a dictionary definition of 'relate to'"]"); <u>see also</u>

<u>Gerosa</u>, 329 F.3d at 327 (stating that the "less-expansive view

of [ERISA] preemption" than employed by the Court prior to

<u>Travelers</u> was anticipated by the Circuit in <u>Aetna Life Ins. Co.</u>

<u>v. Borges</u>, 869 F.2d 142 (2d Cir. 1989)).

The Supreme Court has identified several ways in which

this anti-preemption presumption can be overcome.  When state

law clearly refers to ERISA plans in the sense that "the existence of ERISA plans is essential to the law's operation," or when the state law has a clear connection with a plan to the extent that it "mandates employee benefit structures or their administration" or "provides alternative enforcement mechanisms," the state law will be preempted. Plumbing Ind. Bd., 126 F.3d at 67 (citing Travelers, 514 U.S. at 658); see also Borges, 869 F.2d at 146 ("laws that have been ruled preempted are those that provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee"). Consistent with these principles, the Supreme Court most recently held that ERISA preempts a state law claim when the interpretation of benefit plans forms an essential part of the claim, and liability under state law only exists because of the defendant's administration of ERISA-regulated benefit plans. Aetna Health, Inc. v. Davila, 542 U.S. 200, 213 (2004).

Despite these instances in which the presumption against preemption was overcome, the Second Circuit acknowledges that the Supreme Court's principles are "still not entirely determinate." Gerosa, 329 F.3d at 324. The Second Circuit has identified several clear trends. Id. The Second Circuit notes that state laws that would tend to control or supersede central

ERISA functions have "typically been found preempted." Gerosa,
329 F.3d at 324 ("One product of these tendencies has been that
courts routinely find that garden-variety state-law malpractice
or negligence claims against non-fiduciary plan advisors . . .
are not preempted."). Compare Ingersoll-Rand Co. v. McClendon,
498 U.S. 133, 139-140 (1990) (stating that causes of action that
relate to the essence of the pension plan itself, rather than
simply the benefits of the pension plan, or where liability can
only be established by referencing the pension plan will be
clear cases of preemption) with Geller v. County Line Auto
Sales, Inc., 86 F.3d 18, 23 (2d Cir. 1996) ("garden variety
fraud" claim in the context of an ERISA plan was not preempted)
and Borges, 869 F.2d at 147 (noting that Connecticut's escheat
law does not directly implicate ERISA plans or benefits, but
focuses on abandoned or lost property generally and is not
preempted by ERISA). "Outside these areas, the presumption
against preemption is considerable – state laws of general
application that merely impose some burdens on the
administration of ERISA plans but are not 'so acute' as to force
an ERISA plan to adopt certain coverage or to restrict its
choice of insurers should not be disturbed." Plumbing Ind. Bd.,
126 F.3d at 67. "'What triggers ERISA preemption is not just
any effect on administrative procedures, but rather an effect on
the primary administrative function of benefit plans, such as

determining an employee's eligibility for a benefit and the amount of that benefit.'"  Gresham v. Lumbermen's Mut. Cas. Co., 404 F.3d 253, 258 (4th Cir. 2005) (quoting Borges, 869 F.2d at 146-47).

To determine whether the defendants' counterclaims "relate to" an ERISA plan, the court must examine the content of the counterclaims and whether they have any effect, beyond incidental, on the ERISA plan.  The parties agree that the defendants' tortious interference claim is governed by New Jersey State law.  As discussed more fully, in Part IV.C.ii, infra, under New Jersey law, a claim for tortious interference requires 1) a reasonable expectation of economic advantage to plaintiff, 2) interference done intentionally and with malice, 3) causal connection between the interference and the loss of prospective gain, and 4) actual damages.  As these elements reveal, a cause of action for tortious interference pursuant to New Jersey law is generally applicable and does not directly implicate an ERISA plan.  See Borges, 869 F.2d at 147. Therefore, the presumption against preemption is considerable. Plumbing Ind. Bd., 126 F.3d at 67.

Defendants in this case claim that the Funds have interfered with their relationships with general and sub contractors, costing them business.  This claim does not require the Funds to make any changes regarding the employee benefit

plans or their administration.  While the ERISA plans provide a context through which the relationship between the plaintiff Funds and defendant can be viewed, and reference to the ERISA plan in the course of deciding the counterclaim might be necessary, an interpretation of the benefit plans is not an "essential element" of the tortious interference claim.  See Geller, 86 F.3d at 23.  Nor will any determination made by the court in resolving the counterclaim have an effect on the regulation of the ERISA plan.  As a result, the defendants' tortious interference claim is not "related to" the ERISA plan.

Furthermore, the tortious interference claim is not an alternative enforcement mechanism for enforcing the rights protected by ERISA.  See Plumbing Ind. Bd., 126 F.3d at 68.  The defendants are not "participants" pursuant to ERISA, and thus are excluded from the class of litigants that can enforce the statute.  Based on the foregoing, the plaintiff International Fund's motion for summary judgment to dismiss the tortious interference counterclaim on the grounds of preemption is denied.

### ii. Plaintiff Funds' Motion for Summary Judgment on Defendants' Tortious Interference Counterclaims Due to an Absence of Disputed Material Facts

Although not preempted, the defendants' tortious interference counterclaim against the Funds cannot survive

summary judgment and is hereby dismissed.  As outlined above,
the parties do not dispute that the tortious interference
counterclaim is governed by New Jersey law, which requires 1) a
reasonable expectation of economic advantage to plaintiff,
2) interference done intentionally and with malice, 3) causal
connection between the interference and the loss of prospective
gain, and 4) actual damages.  Olde Monmouth Stock Transfer Co.
v. Depository Trust & Clearing Corp., 485 F. Supp. 2d 387, 397
(S.D.N.Y. 2007) (citing Varrallo v. Hammond, Inc., 94 F.3d 842,
848 (3d Cir. 1996) (citing Printing Mart-Morristown v. Sharp
Elecs. Corp., 563 A.2d 31, 37 (N.J. 1989))).

     Plaintiff Funds argue that defendants have failed to
present any evidence that establishes elements (2) and (3) of
the tortious interference claim: respectively, intentional and
malicious interference, and a causal connection between the loss
and the interference.  (Local Funds Mem. at 15-19.)  The court
finds that there is insufficient evidence for a jury to
reasonably conclude that the plaintiff Funds acted with malice,
and, therefore, defendants fail to satisfy that element of the
claim.  Anderson, 477 U.S. at 249-50.  In so finding, the court
does not reach the question of whether a genuine issue of
material fact is present with regard to the claim's causal
element.

The Supreme Court of New Jersey defines "malice" "to
mean that the harm was inflicted intentionally and without
justification or excuse." Printing Mart, 563 A.2d at 39. The
inquiry of whether interference was with malice must focus on
the propriety of the actor's actions in the context of the case
presented. MacDougall v. Weichert, 677 A.2d 162, 174 (N.J.
1996). The "ultimate inquiry is whether the conduct was both
injurious and transgressive of generally accepted standards of
common morality or of law." Printing Mart, 563 A.2d at 40
(quotations omitted). Such conduct would include fraud,
misrepresentation, intimidation, and threat of unjustifiable
legal action. Artco, Inc. v. Kidde, Inc., 88-cv-5734, 1993 U.S.
Dist. LEXIS 21227, *61 (S.D.N.Y. December 28, 1997).

        To determine whether an action constitutes malice, New
Jersey's Supreme Court instructs courts to balance the factors
outlined in the Restatement (Second) of Torts § 767B cmt. a, §
767 (1979) for determining whether interference is "improper."
MacDougall, 677 A.2d at 174. The factors delineated in the
Restatement are "(a) the nature of the actor's conduct, (b) the
actor's motive, (c) the interests of the other with which the
actor's conduct interferes, (d) the interests sought to be
advanced by the actor, (e) the social interests in protecting
the freedom of action of the actor and the contractual interests
of the other, (f) the proximity or remoteness of the actor's

conduct to the interference, and (g) the relations between the parties."  Restatement (Second) of Torts § 767 (1979).

The New Jersey Supreme Court notes that when the actor's interest is economic it is "important and will normally prevail over a similar interest of the other if the actor does not use wrongful means." Macdougall, 677 A.2d at 174 (internal quotations omitted).  However, "[t]he justification must be as broad as the act, and must cover not only the motive and the purpose, or, in other words, the object sought, but also the means used." Printing Mart, 563 A.2d at 41 (quotations omitted).

The crux of defendants' counterclaim is premised on letters sent from the Funds' counsel, Virginia, to BCC/Belle on June 27, 2002 and from Collection Agent Marks, on October 2, 2002.  The letters state that the signatory has been advised from their respective clients that Speedwell is performing tile work for BCC/Belle without making contributions and that this is in violation of the collective bargaining agreement between Speedwell and Local 7.  (Virginia Decl., Ex. 13, 16.)

In support of their claim and in opposition to plaintiffs' motion for summary judgment, defendants claim that they were up to date with their remittance reports and that the remittance reports accurately reflected that no contribution was due.  Furthermore, defendants cite actions by Bartalone acting

in his capacity as a business agent for Local 7 and contacts
made with defendants directly, rather than a third party.

Defendants' opposing facts are not sufficient to
establish a genuine issue for trial as to whether the actions
taken by the Funds were done maliciously.  First, the Funds'
letters to BCC/Belle were sent after Virginia sent a letter to
Speedwell regarding the delinquencies and gave Speedwell ample
time to respond before the Funds took additional action.  The
letters sent to BCC/Belle and Speedwell do not contain any
threatening language, or threats of legal action.  Instead, the
letters from plaintiffs' counsel inform BCC/Belle of Speedwell's
delinquency.  Additionally, although the court will not opine at
this juncture about whether the alleged colluding between the
Funds and the Union occurred and, if it did, whether it was
unlawful, the evidence does not establish a genuine issue of
material fact from which a jury could reasonably conclude that
the plaintiff Funds acted without justification or excuse.
Moreover, Bartalone's acts do not establish a genuine issue of
material fact as to whether Virginia and Marks wrote to
BCC/Belle with the requisite mental state of malice.  To infer,
on this record, that Virginia's and Marks' actions were to
further Bartalone's alleged motive to "put Speedwell out of
business," is an unreasonable conclusion.  Instead, the record
supports an inference that Virginia and Marks passively relied

on Bartalone and Hill's account of the facts, which would negate the element of intentional and malicious conduct.

A factually similar case addressed by the District of New Jersey is instructive. In <u>Cellco v. Commc'n Workers of America</u>, the plaintiff, Cellco Partnership d/b/a Verizon Wireless, brought a tortious interference claim against a union with whom Verizon Wireless had a labor dispute. Civil Action No. 02-5542 (MLC), 2003 U.S. Dist. LEXIS 26823, *36-37 (D.N.J. Dec. 11, 2003). During the course of the union's demonstrations, it used Cellco's trademarked slogan allegedly "with the intention of encouraging [union members or supporters who were also Cellco customers] to breach or terminate their contracts" with Cellco. <u>Cellco</u>, 2003 U.S. Dist. LEXIS 26823 at *36-37. The court granted the union's motion to dismiss the tortious interference claim, stating that "Verizon and the CWA were involved in a labor dispute, and it was in this context that the CWA used Cellco's slogan." <u>Id.</u> at 39. The district court acknowledged that the union's use of the slogan potentially had a "coercive impact" on Cellco, but found the use of the slogan justified. <u>Id.</u> at 38.

Defendants ground their claim on the plaintiff Funds having notified BCC/Belle of the defendants' alleged delinquency with the intent of disrupting defendants' relationship with BCC/Belle. However, to the extent that plaintiff Funds'

notifiations might have been detrimental to the defendants' relationship with BCC/Belle, it was justified in the context of the dispute. The significant interest the Funds had in sending the letters – which was both economic and in fulfillment of their fiduciary duties – is not broader than the act of interference – two letters sent to a general contractor after Speedwell had notice of and an opportunity to address the alleged delinquency. As a result, the defendants have not established that there is a genuine issue of material fact as to whether this interference was justified. Therefore, the plaintiff Funds' motion for summary judgment is granted and defendants' counter claims for tortious interference are dismissed.

## CONCLUSION

In light of the foregoing, the parties' motions and cross-motions for summary judgment are granted in part and denied in part as follows: 1) Defendants' motion for summary judgment that the 2001 Agreements are not collective bargaining agreements but single-project agreements and, regardless, are invalid for fraud in the execution is denied. Summary judgment on the issue of fraud in the execution will be entered in favor of plaintiffs if the defendants do not come forward with evidence (produced during discovery which closed on December 30, 2007) establishing a genuine issue of material fact within

fifteen days of entry of this order.  2) Defendants' motion for summary judgment dismissing the claim because the plaintiff Union (a) failed to exhaust contractual remedies contained in the 2001 Agreements, (b) is barred by the statute of limitations, and (c) lacks associational standing to bring a claim on behalf of its members is denied.  3) Defendants' summary judgment motion that Speedwell is not liable for contributions to benefits funds because (a) the collection action is in violation of ERISA and (b) benefits funds are illegal is denied.  4) Plaintiffs Funds and Union's motion for summary judgment that the auditor's report is dispositive of damages between February 20, 2001 and May 31, 2003 is denied.  5) Plaintiff Union's motion for summary judgment dismissing defendants' NLRA § (8)(b)(4)(ii)(B) claim is granted, with the exception of the claim regarding the TravelLodge project, over which there exist genuine issues of material fact for all three elements of the § (8)(b)(4)(ii)(B) claim.  6) Plaintiff International Funds' motion for summary judgment against the defendants on the ground that the defendants' tortious interference counter-claim is preempted by ERISA is denied.  7) Plaintiff Funds' motion for summary judgment against the defendants dismissing defendants' tortious interference claim is granted.

Furthermore, no later than fifteen days from entry of this Memorandum and Order, plaintiffs shall substitute new trustees and other officials for those individuals currently named in this action who no longer represent the Funds or the Union in the capacity under which they originally brought suit.

The parties shall appear for a telephone status conference on April 21, 2009 at 11:00 AM.  Plaintiffs shall initiate the call.

**SO ORDERED.**

Dated: March 31, 2009
       Brooklyn, New York

                              _____  /s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York